UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LEAH CHAPPELL,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,[1]

    Defendant.

CASE NO. 12-cv-05948 JRC

ORDER ON PLAINTIFF'S COMPLAINT

This Court has jurisdiction pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73 and Local Magistrate Judge Rule MJR 13 (*see also* Notice of Initial Assignment to a U.S. Magistrate Judge and Consent Form, ECF No. 5; Consent to Proceed Before a United States Magistrate Judge, ECF No. 6). This matter has been fully briefed (*see* ECF Nos. 13, 14, 15).

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

Plaintiff has "long term chronic mental health difficulties" (Tr. 368), caused in large part by physical, emotional, and sexual abuse during her formative years, and continuing into her adult life. The ALJ choose to accept the conclusions of a non-examining state psychologist who reviewed some, but not all, of the mental health care records and concluded that plaintiff was capable of some form of work. The reviewing state psychologist did not have available to her subsequent testing and psychological evaluations that further supported a different conclusion, including a report by an examining psychologist, who conducted extensive psychological testing and concluded that plaintiff was "[c]learly disabled from sustained gainful employment" (Tr. 368).

For these reasons, and others set forth below, this matter is reversed and remanded for further consideration.

## BACKGROUND

Plaintiff, LEAH CHAPPELL, was born in 1983 and was 24 years old on the amended alleged date of disability onset of September 1, 2008 (*see* Tr. 21, 38, 133, 140).

Plaintiff testified:

> I grew up on Harstene Island before it was really populated. I went to a private school, which was a mobile home in somebody's yard. I was severely – my mother was, I think, a religious fanatic. I don't know the right word for it."

(Tr. 45-46).

Without going in to great detail, the medical records reveal an upbringing where plaintiff was cloistered as a child, not allowed to go into the public regularly, and suffered periods of sexual, emotional, and physical abuse (*see* Tr. 316-17, 333, 345, 355).

She had been "struggling with depression since she was very young" (Tr.345). Her problems included an eating disorder, cutting herself for many years, and hospitalization for mental health issues (*id.*). She described often waking up in the middle of night anxious and suffering from frightening hallucinations, and noted that she "grew up in a closet hiding; I don't have a current closet, so I feel like I sleep less" (Tr. 364).

Things did not improve when she became an adult. She was a victim of sexual crimes and found herself in an abusive relationship. Among other things,

> She was choked by her former partner to unconsciousness once while bathing her girls, then left for dead, neighbor saw the door open and found her, called the police. She's moving in 2 weeks and has a no contact order.

(*see* Tr. 257).

Plaintiff has received medication for depression and anxiety (*see* Tr. 57-8, 260). Among her symptoms, plaintiff has thoughts racing at night, difficulty sleeping (Tr. 260), outbursts of anger, difficulty concentrating, panic attacks, feeling immense dread and of not wanting to go out and go places. She has received mental health counseling on several occasions (Tr. 320-30, 399).

Plaintiff has at least the severe impairments of "posttraumatic stress disorder, panic disorder/anxiety, personality disorder, and depression (20 CFR 404.1520(c) and 416.920(c))" (Tr. 23).

Although plaintiff never completed high school, she has her GED (Tr. 41) and has previously worked as a cashier in a gas station, a day care helper, and a home health aide (Tr. 42-44).

At the time of the hearing, plaintiff was living with her two daughters (Tr. 41).

## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance ("DIB") benefits pursuant to 42 U.S.C. § 423 (Title II) and Supplemental Security Income ("SSI") benefits pursuant to 42 U.S.C. § 1382(a) (Title XVI) of the Social Security Act in May, 2009 (*see* Tr. 21, 133-143). The applications were denied initially and following reconsideration (Tr. 63-66). Plaintiff's requested hearing was held before Administrative Law Judge Stephanie Martz ("the ALJ") on June 21, 2011 (*see* Tr. 35-62). On June 29, 2011, the ALJ issued a written decision in which the ALJ concluded that plaintiff was not disabled pursuant to the Social Security Act (*see* Tr. 18-34).

On September 10, 2012, the Appeals Council denied plaintiff's request for review, making the written decision by the ALJ the final agency decision subject to judicial review (Tr. 1-6). *See* 20 C.F.R. § 404.981. Plaintiff filed a complaint in this Court seeking judicial review of the ALJ's written decision in October, 2012 (*see* ECF Nos. 1, 3). Defendant filed the sealed administrative record regarding this matter ("Tr.") on January 15, 2013 (*see* ECF Nos. 10, 11).

In plaintiff's Opening Brief, plaintiff raises the following issues: (1) Whether or not the ALJ provided legitimate reasons for rejecting the opinions of plaintiff's treating physicians, Dr. Truschel and Dr. Sattar; (2) Whether or not the ALJ provided legitimate reasons for rejecting the opinions of Dr. Neims, the examining psychologist who met with and tested plaintiff and reviewed the entire file; (3) Whether or not the ALJ's

residual functional capacity assessment was complete, without the specific limitations identified by the State Agency doctors, whose opinions she gave "significant weight"; (4) Whether or not the ALJ's adverse credibility analysis was legally adequate; (5) Whether or not the ALJ was required to consider the side-effects of prescribed medication; and (6) Whether or not this case should be remanded for payment of benefits, rather than further administrative proceedings (*see* ECF No. 13, p. 2).

## STANDARD OF REVIEW

Plaintiff bears the burden of proving disability within the meaning of the Social Security Act (hereinafter "the Act"); although the burden shifts to the Commissioner on the fifth and final step of the sequential disability evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140, 146 n. 5 (1987). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment "which can be expected to result in death or which has lasted, or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled pursuant to the Act only if claimant's impairment(s) are of such severity that claimant is unable to do previous work, and cannot, considering the claimant's age, education, and work experience, engage in any other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits if the ALJ's findings are based on legal error or not

supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (*citing Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999)). Regarding the question of whether or not substantial evidence supports the findings by the ALJ, the Court should "'review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" *Sandgathe v. Chater*, 108 F.3d 978, 980 (1996) (per curiam) (*quoting Andrews, supra*, 53 F.3d at 1039). In addition, the Court must determine independently whether or not "'the Commissioner's decision is (1) free of legal error and (2) is supported by substantial evidence.'" *See Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2006) (*citing Moore v. Comm'r of the Soc. Sec. Admin.,* 278 F.3d 920, 924 (9th Cir. 2002)); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

According to the Ninth Circuit, "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and actual findings offered by the ALJ - - not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (*citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (other citation omitted)); *see also Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012) ("we may not uphold an agency's decision on a ground not actually relied on by the agency") (*citing Chenery Corp, supra*, 332 U.S. at 196). In the context of social security appeals, legal errors committed by the ALJ may be considered harmless where the error is irrelevant to the ultimate disability conclusion when considering the record as a whole. *Molina, supra*,

674 F.3d at 1117-1122; *see also* 28 U.S.C. § 2111; *Shinsheki v. Sanders*, 556 U.S. 396, 407 (2009).

DISCUSSION

**1. Whether or not the ALJ provided legitimate reasons for rejecting the opinions of plaintiff's treating psychiatrists, Dr. Truschel and Dr. Sattar**

In August of 2009, plaintiff met with psychiatrist, T. Lincoln Truschel, M.D., who diagnosed plaintiff with a personality disorder NOS, with borderline, compulsive and avoidant traits (Tr. 318). He also diagnosed posttraumatic stress disorder, depressive disorder, panic disorder with agoraphobia and social phobia (*id.*). Dr. Truschel gave her a GAF score of 45 and prescribed Wellbutrin and Rozerem (Tr. 318-19). He continued to manage her care at Behavior Health Resources ("BHR"), where she was seen for several months by mental health counselors (Tr. 320-36).

In May of 2010, a physician at Sea Mar Community Health Center, Dr. Anjan Sattar, M.D., took over her treatment and again diagnosed PTSD, major depressive disorder, panic disorder, personality disorder, NOS, and "some strong cluster B personality traits along with some avoidance traits noticed" (Tr. 345). He gave her a GAF score of 50 (*id.*). Plaintiff restarted mental health therapy and participated in 24 sessions over the following year (Tr. 399).

Neither of these doctors did a functional analysis nor appear to have offered an opinion regarding whether or not plaintiff was capable of working. Nevertheless, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision (DSM-IV-TR) by the American Psychiatric Association (2000), a GAF score of

41-50 indicates "serious symptoms OR any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job)."

While the ALJ failed to refer to Dr. Truschel and Dr. Sattar by name, she did refer to these physicians' GAF scores, as well as other GAF scores that were in the 40 to 50 range and two that were 55 and 56, respectively (Tr. 27 (*citing* Tr. 312, 318, 345, 358 and 367)). The ALJ discounted these GAF scores and stated:

> These scores are quite low, and they are further inconsistent with the claimant's own self-reported activities. For example, the claimant reported (sic) does laundry, attends appointments, cleans her apartment, prepares meals, does laundry (sic), attends field trips with her daughter's school, takes care of her children, reads, and goes shopping (citation omitted). It was also reported that claimant enjoys gardening, goes for walks, gathering wood, and picking berries (citation omitted). In addition, GAF scores are highly subjective. GAF scores intertwine psychological symptoms, physical impairments, and socioeconomic factors, and therefore I cannot place a high degree of reliance on this score or any opinions associated with this score.

(Tr. 27-28.)

Instead, the ALJ gave "significant weight" to the opinion of state psychologist, Cynthia Collingwood, Ph.D. who reviewed the file on December 3, 2009 and who prepared a mental residual functional capacity assessment in which she concluded that plaintiff was moderately limited in "the ability to understand and remember detailed instruction," "the ability to carry out detailed instructions," "the ability to maintain attention and concentration for extended periods," "the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances," "the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform a consistent pace without an

unreasonable number and length of rest positions," "the ability to interact appropriately with the general public," and "the ability to respond appropriately to changes in the work setting." (Tr. 296-97.) Dr. Collingwood provided very little explanation for the conclusions other than observing that claimant goes out to the gym and has had "significant improvement in SX since starting meds" (Tr. 298). Dr. Collingwood concluded "the claimant is capable of managing life's basic adaptive needs" (*id.*). The ALJ accepted Dr. Collingwood's opinion, and the opinion of Bruce Eather, Ph.D., who provided a one-line endorsement of Dr. Collinwood's opinion (Tr. 337), "because they based their opinions upon a thorough review of the claimant's medical records. Their opinions are also consistent with the claimant's own stated activities, such as preparing meals, taking care of her children, doing laundry, cleaning, and going grocery shopping" (citation to the record deleted) (Tr. 27).

In summary, the ALJ chose to accept a non-examining reviewing psychologist's opinion regarding plaintiff's overall functioning, over the general functioning assessments of examining and treating doctors Truschel and Sattar. The ALJ gave three specific reasons for discounting those treating doctor's opinions: First, that the reviewing psychologist based her opinion on "a thorough view of claimant's medical records;" second, the GAF scores given by her treating and examining doctors were "highly subjective;" and third, their opinions "were not consistent with claimant's own self-reported activities" (*see* Tr. 27-28). Each of these reasons will be evaluated in light of the following legal standard.

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (*citing Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). Determining whether or not inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999)). If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and questions of credibility lies with the ALJ. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (*quoting Waters v. Gardner*, 452 F.2d 855, 858 n.7 (9th Cir. 1971) (*citing Calhoun v. Bailar*, 626 F.2d 145, 150 (9th Cir. 1980))). Here, the ALJ considered the conclusions of Dr. Truschel and Dr. Sattar as inconsistent with the conclusions of Dr. Collingwood and Dr. Eather.

"A treating physician's medical opinion as to the nature and severity of an individual's impairment must be given controlling weight if that opinion is well-supported and not inconsistent with the other substantial evidence in the case record." *Edlund v. Massanari*, 2001 Cal. Daily Op. Srvc. 6849, 2001 U.S. App. LEXIS 17960 at *14 (9th Cir. 2001) (*citing* SSR 96-2p, 1996 SSR LEXIS 9); *see also Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). When the decision is unfavorable, it must "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the [] opinion and the reasons for that weight." SSR 96-2p, 1996 SSR LEXIS 9 at *11-*12.

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician or psychologist. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (*citing Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990)). Even if a treating or examining physician's opinion is contradicted, that opinion can be rejected only "for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester, supra*, 81 F.3d at 830-31 (*citing Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)). The ALJ can accomplish this by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (*citing Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

Regarding the ALJ's observation that the state reviewing psychologist's opinions should be given "significant weight because it is based on a 'thorough review of claimant's medical records,'" (Tr. 27) it is clear that the medical records reviewed by the state psychologists did not include medical evidence from Dr. Sattar and Dr. Neims, both of whom saw plaintiff after the state psychologist conducted her review. Dr. Sattar not only made a number of observations regarding plaintiff's past condition but also oversaw her mental health therapy, which included 24 sessions over the following year (Tr. 399; *see also* Tr. 391-98). None of this was considered by the reviewing psychologist. Dr. Neims administered eight psychological tests, and prepared a narrative report and medical source statement in October, 2010 (Tr. 361-70). His opinion, consistent with her

treating psychiatrists, assessed plaintiff with a GAF score of 46 and concluded that plaintiff was "clearly disabled from sustained gainful employment relative to mental health difficulties for the foreseeable 12 months or longer" (Tr. 368). Dr. Neims also opined that the onset date of May 31, 2007 "appears quite reasonable against provided information which suggests long term chronic mental health difficulties" (Tr. 368). Dr. Neims reported on twenty work activities that SSA has determined are required in any job (Tr. 369-70) and concluded that plaintiff had severe inability to accept instructions and respond appropriately to criticism from supervisors and marked limitations in eleven other categories (Tr. 369-70). Again, it is clear that the reviewing psychologist did not have this information available either.

Dr. Neims' information was critical, as this is the only psychological testing that appears in the record and was conducted after the state psychologist reviewed the medical evidence. Therefore, the ALJ's conclusion that the reviewing psychologist based their opinion on "a thorough review of claimant's medical records" is not supported by substantial evidence in the record.

Regarding the ALJ's observation that "GAF scores are highly subjective" (Tr. 28), it should be noted that each of the doctors conducted a mental status examination before reaching their conclusions regarding plaintiff's GAF score. The Court notes that "experienced clinicians attend to detail and subtlety in behavior, such as the affect accompanying thought or ideas, the significance of gesture or mannerism, and the unspoken message of conversation. The Mental Status Examination allows the organization, completion and communication of these observations." Paula T. Trzepacz

and Robert W. Baker, The Psychiatric Mental Status Examination 3 (Oxford University Press 1993). "Like the physical examination, the Mental Status Examination is termed the *objective* portion of the patient evaluation." *Id.* at 4 (emphasis in original).

The Mental Status Examination generally is conducted by medical professionals skilled and experienced in psychology and mental health. Although "anyone can have a conversation with a patient, [] appropriate knowledge, vocabulary and skills can elevate the clinician's 'conversation' to a 'mental status examination.'" Trzepacz, *supra*, The Psychiatric Mental Status Examination 3. A mental health professional is trained to observe patients for signs of their mental health not rendered obvious by the patient's subjective reports, in part because the patient's self-reported history is "biased by their understanding, experiences, intellect and personality" (*id.* at 4), and, in part, because it is not uncommon for a person suffering from a mental illness to be unaware that her "condition reflects a potentially serious mental illness." *Van Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (citation omitted).

Granted, the GAF score is subjective, but it is based, in part, on the Mental Status Examination that is considered the "objective" portion of the evaluation. Therefore, the ALJ's conclusion that these scores should be discounted because they are "subjective" is not a legitimate reason supported by substantial evidence in the record.

Regarding the ALJ's conclusion that the GAF scores are "inconsistent with the claimant's own self-reported activities" (Tr. 27-28), the ALJ made no attempt to relate GAF scores to daily activities – and this Court does not know how to do so, either. GAF scores are found at Axis V of the DSM-IV-TR, which is for reporting the clinician's

judgment of plaintiff's overall level of functioning (DSM-IV-TR, page 27). The clinician must use his or her judgment based on the evaluation process. These physicians conducted mental status examinations and reached remarkably similar conclusions regarding plaintiff's GAF score (*compare* Tr. 318 *and* 345). When an ALJ seeks to discredit a medical opinion, she must explain why her own interpretations, rather than those of the doctors, are correct. *Reddick, supra*, 157 F.3d at 725 (*citing Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)); *see also Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) ("When mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professional trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation") (*quoting Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987) (*quoting Lebus v. Harris*, 526 F.Supp. 56, 60 (N.D. Cal. 1981))); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor. The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomena are often wrong") (internal citations omitted)).

      The ALJ's explanation that the GAF scores are inconsistent with her self-reported daily activities, without more, is not sufficiently specific and legitimate to discount the examining physician's conclusions.

Furthermore, the errors set forth above are harmful. The Ninth Circuit has "recognized that harmless error principles apply in the Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (*citing Stout v. Commissioner*, *Social Security Administration*, 454 F.3d 1050, 1054 (9th Cir. 2006) (collecting cases)). The court noted that "several of our cases have held that an ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record." *Id.* (citations omitted).

Here, the ALJ failed to provide any specific and legitimate reason for discounting the opinion of plaintiff's treating mental health care providers, who consistently found that plaintiff's GAF score was within the range that could affect her ability to keep a job. When plaintiff finally was tested by Dr. Neims, his conclusion that plaintiff was "[c]learly disabled from sustained gainful employment" (Tr. 368) was not even considered by the reviewing state psychologist, whom the ALJ relied upon to reach her conclusions. Had the ALJ credited these rejected opinions, she may very well have reached a different conclusion regarding disability.

> **2. Whether or not the ALJ provided legitimate reasons for rejecting the opinions of Dr. Neims, the examining psychologist who met with and tested plaintiff and reviewed the entire file**.

As noted above, Dr. Neims appears to be the only mental health specialist who administered formal psychological testing on plaintiff and provided detailed opinions regarding the effect of her mental illness on specific work related activities (*see* Tr. 361-70). The ALJ stated:

> I give little weight to Dr. Neims' opinion because his opinion is inconsistent with the claimant's largely normal activities of shopping, taking care of her children, going to parks and the library, volunteering at her daughters' school, preparing meals, doing laundry, and cleaning her apartment (citations to the record omitted). Dr. Neims' opinion is also inconsistent with her treating psychiatrist's notes, which consistently show no abnormalities, and that the claimant's mood and affect are normal (citations omitted).

(Tr. 27.)

It should be noted that the Ninth Circuit has made clear that plaintiff's ability to engage in activities of daily living does not necessarily mean that plaintiff is capable of full employment. The ALJ is required to evaluate whether or not these activities of daily living meet "the threshold for transferable work skills." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (*citing Fair, supra,* 885 F.2d at 603). As stated by the Ninth Circuit, the ALJ "must make 'specific findings relating to the daily activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Orn, supra,* 495 F.3d at 639 (*quoting Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)). Although *Orn* involved plaintiff's credibility, the same analysis can be applied to the opinions of an examining psychologist. Certainly, Dr. Neims was aware of plaintiff's level of activity. For instance, Dr. Neims knew that plaintiff volunteered at school but also noted that "this is often difficult for her to tolerate the social interactions with others at this setting" (Tr. 363). He also was aware that she took care of her children, was able to shop, and make her own meals (*id.*). Nevertheless, when it came to evaluating her capacity to work, Dr. Neims used his professional judgment and concluded that these activities of daily living did not necessarily translate into transferable work

skills. The ALJ failed to provide a specific and legitimate reason for discounting that opinion.

As to the ALJ's conclusion that Dr. Neims' opinion was inconsistent with her treating psychiatrist's notes, this observation is simply not supported by the record. As noted above, the ALJ also recognized that plaintiff's mental health providers assessed plaintiff's GAF scores largely in the 45 to 50 range and noted that "these scores are quite low" (Tr. 27). As noted above, the ALJ previously had discounted these opinions because they were inconsistent with her conclusion that plaintiff was capable of working (Tr. 28). Therefore, this claimed inconsistency with her treating psychiatrists' observations cannot provide a legitimate reason to reject Dr. Neims' opinion as they are largely consistent with Dr. Neims' conclusions. As noted by plaintiff, citing the case of *Nguyen v. Chatter*, 100 F.3d 1462 (9th Cir. 1996):

> Where the purported existence of an inconsistency is squarely contradicted by the record, it may not serve as the basis for the rejection of an examining physician's conclusion.

*Id* at 1465. An ALJ is not permitted to "manufacture a conflict between a treating and examining physician, and then use the purported inconsistency to discredit the examining physician's opinion." *Ryan v. Commissioner*, 528 F.3d 1194, 1201 fn. 6 (9th Cir. 2008).

For the above reasons, the ALJ failed to provide specific and legitimate reasons for discounting the opinions of Dr. Neims.

//

//

### 3. Whether or not the ALJ's residual functional capacity assessment was complete, whether or not the ALJ's adverse credibility analysis was legally adequate, and whether or not the ALJ was required to consider the side-effects of prescribed medication.

Because this Court has already ruled that the ALJ failed to provide specific and legitimate reasons for discounting the opinions of treating and examining doctors, this Court need not discuss the errors set forth in the remainder of plaintiff's brief.

### 4. Whether or not this case should be remanded for payment of benefits, rather than further administrative proceedings.

The decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court. *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989) (*citing Varney v. Secretary of HHS*, 859 F.2d 1396, 1399 (9th Cir. 1988)).

Generally, when the Social Security Administration does not determine a claimant's application properly, "'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). However, the Ninth Circuit has put forth a "test for determining when [improperly rejected] evidence should be credited and an immediate award of benefits directed." *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (*quoting Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). It is appropriate when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman, supra,* 211 F.3d at 1178 (*quoting Smolen*, *supra*, 80 F.3d at 1292).

Here, outstanding issues must be resolved. *See Smolen, supra*, 80 F.3d at 1292.

There is clearly a conflict in the record between the conclusions provided by the reviewing state psychologist, Dr. Collingwood, and the examining psychologist, Dr. Neims, for example. They reached inconsistent conclusions regarding plaintiff's functional capacity (*compare* Tr. 369-70 *with* Tr. 296-98). While the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Neims' opinions, the inconsistency between those opinions, among others, should not be resolved by this Court.

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (*citing Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995)). If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and questions of credibility lies with the ALJ. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1999) (*quoting Waters v. Gardner*, 452 F.2d 855, 858 n.7 (9th Cir. 1971) (*citing Calhoun v. Bailar*, 626 F.2d 145, 150 (9th Cir. 1980))).

## CONCLUSION

Based on these reasons and the relevant record, the Court **ORDERS** that this matter be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further consideration.

**JUDGMENT** should be for plaintiff and the case should be closed.

Dated this 9th day of January, 2014.

J. Richard Creatura
United States Magistrate Judge